**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LINDA HART-HYDE, | : | Case No. 2:09-CV-500 |
| Plaintiff, | : | Judge Watson |
| | : | Magistrate Judge Abel |
| vs. | : | |
| GROUP LONG TERM DISABILITY | : | |
| PLAN FOR EMPLOYEES OF JP | | **DEFENDANTS' MOTION FOR** |
| MORGAN CHASE BANK, et al., | : | **JUDGMENT ON THE** |
| | | **ADMINISTRATIVE RECORD** |
| Defendants. | : | |

_____

Defendants Group Long Term Disability Plan for Employees of JP Morgan Chase Bank and Hartford Life and Accident Insurance Company ("Hartford") (collectively "Defendants") submit this Motion For Judgment On The Administrative Record pursuant to the applicable procedures under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").  A memorandum in support of this Motion is attached.

Respectfully submitted,

 s/  Caroline H. Gentry
_____
Caroline H. Gentry (0066138)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, Ohio  45402-2028
(937) 449-6748 / (937) 449-6820 Fax
cgentry@porterwright.com

ATTORNEY FOR DEFENDANTS

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

**I.      INTRODUCTION.**

Defendants Group Long Term Disability Plan for Employees of JP Morgan Chase Bank ("Plan") and Hartford Life and Accident Insurance Company ("Hartford") (collectively "Defendants") move for judgment in their favor because, as shown below, the administrative record and governing case law establish that Hartford's denial of the Plaintiff's claim was reasonable and neither arbitrary nor capricious.  Accordingly, the Court should grant this Motion.

**II.     AN ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW APPLIES.**

**A.      The Plan Grants Discretionary Authority To Hartford.**

The Plan provides that "[w]e have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Admin. Record ("R."), filed at Docket No. 10, at 26).  "We" means Hartford Life and Accident Insurance Company.  (R. 31).  Therefore, the arbitrary and capricious standard of review applies.

**B.      In A Recent Decision, The United States Supreme Court Strongly Affirmed Use Of A Deferential Standard When Reviewing ERISA Benefits Decisions.**

The Supreme Court very recently reinforced its prior holdings that courts should defer to administrators with discretionary authority to make benefits decisions under an ERISA plan.  In *Conkright v. Frommert*, Case No. 08-810, 559 U.S. ___ (Apr. 21, 2010), the Court reaffirmed its prior holding in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) and explained that public policy strongly supports granting such deference:

> Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place.  We have therefore recognized that ERISA represents a "'careful balancing'" between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."  Congress sought "to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place."

ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred."

*Firestone* deference protects these interests and, by permitting an employer to grant primary interpretive authority over an ERISA plan to the plan administrator, preserves the 'careful balancing' on which ERISA is based.  Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation.  It also promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review.  Moreover, *Firestone* deference serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan, like the one here, that covers employees in different jurisdictions—a result that "would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them."  Indeed, a group of prominent actuaries tells us that it is impossible even to determine whether an ERISA plan is solvent … if the plan is interpreted to mean different things in different places.

*Conkright*, Slip Op. at 9-10 (quotations omitted).

### C.    An Inherent Conflict Of Interest Does Not Change The Standard Of Review.

In *Conkright*, the Supreme Court also explained that it "expanded *Firestone*'s approach" in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. ___, 128 S. Ct. 2343, 2349-50 (2008), by holding that "when the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict." *Conkright*, Slip Op. at 4-5.  Thus, the dual role of an insurer like Hartford in the administration and payment of claims should be considered as a factor by the reviewing district court, but it does not alter the arbitrary and capricious standard of review.  *Glenn*, 128 S. Ct. at 2349-50.  In that case, the Court acknowledged Metropolitan's argument that an insurer likely has much greater incentive than a self-insuring employer to provide accurate claims processing because it has already accounted actuarially for paying claims, and because "the marketplace (and regulators) may well punish an insurance company when its products, or ingredients of its products, fall below par."  *Id*. at 2349.

2

The Sixth Circuit has consistently applied this same approach—the conflict of interest inherent in even a self-funded plan does not alter the standard of review. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 435 (6th Cir. 1998).  Rather, it is simply taken into account as a factor in determining whether a decision was arbitrary and capricious.  The Sixth Circuit also has held that a less deferential standard of review will apply only if there is "significant evidence" that the denial was motivated improperly by self-interest or bad faith.  137 F.3d at 433.

There is no such evidence here.  The appeal specialist who handled the Plaintiff's final appeal, Joye Kelly, has attested that the decision to deny Plaintiff's claim was not motivated by self-interest or a desire to avoid paying benefits but, instead, was based on the Plan provisions and information in the administrative record.  (Declaration of Joye Kelly ("Kelly Decl."), Ex. A at ¶ 2).  Ms. Kelly properly considered documents submitted by the Plaintiff.  (Id. at ¶¶ 3-4).  She did not discuss the Plaintiff's claim with either the claims Examiner who made the initial denial or the Appeal Specialist who decided the first appeal.  (Id. at ¶¶ 5-6).  She also did not discuss the claim with anyone in Hartford's financial or underwriting department.  (Id. at ¶ 7).  Finally, she does not receive any remuneration, bonus, award, recognition or other incentive to deny claims for benefits.  (Id. at ¶ 8).  Instead, her performance evaluations are based on the accuracy of her decision-making, regardless of whether it results in an award or denial of benefits.  (Id.)

In sum, the final appeal was handled by an appeal specialist who was not involved in the initial decision, and there is no evidence that any Hartford employee who decided Plaintiff's claim was involved in company finances or gained any advantage from inaccurate decision-making.  *Glenn*, 128 S. Ct. at 2351.  Therefore, there is no reason to alter the standard of review.

**D.      The "Arbitrary And Capricious" Standard Is Highly Deferential.**

The Sixth Circuit has held that the arbitrary and capricious standard of review "is the least demanding form of judicial review of administrative action."  *Williams v. Int'l Paper Co.*,

227 F.3d 706, 712 (6th Cir. 2000). This Court should uphold a decision to deny benefits "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 594 F.3d 496, 500 (6th Cir. 2010). "Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams*, 227 F.3d at 712.

As shown below, Hartford's decision was supported by substantial evidence and resulted from a deliberate and principled reasoning process. It is also more than "possible to offer a reasoned explanation" for Hartford's decision. Therefore, Defendants are entitled to judgment.

## III. STATEMENT OF FACTS.

The following facts are taken from the administrative record (filed at Docket No. 10).

### A. Relevant Plan Provisions.

#### DEFINITIONS

**Disability or Disabled** means:
1. during the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation;
2. for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre-disability Earnings;
3. after that, you are prevented from performing one or more of the Essential Duties of Any Occupation. (R. 28).

\*\*\*\*

**Essential Duty** means a duty that:
1. is substantial, not incidental;
2. is fundamental or inherent to the occupation; and
3. cannot be reasonably omitted or changed.

To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty. (R. 28).

\*\*\*\*

**Mental Illness** means any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological,

4

behavioral or emotional disorders, but excluding demonstrable, structural brain damage.  (R. 29).

****

## SCHEDULE OF INSURANCE

**The Elimination Period** is the period of time you must be Disabled before benefits become payable.  It is the first 182 consecutive day(s) of any one period of Disability.  (R. 13).

****

## BENEFITS

**When do benefits become payable?**
You will be paid a monthly benefit if:
1.      You become Disabled while insured under this plan;
2.      You are Disabled throughout the Elimination Period;
3.      You remain Disabled beyond the Elimination Period;
4.      You are, and have been during the Elimination Period, under the Regular Care of a Physician; and
5.      You submit Proof of Loss satisfactory to us.  (R. 16).

****

## MENTAL ILLNESS AND SUBSTANCE ABUSE BENEFITS

**Are benefits limited for Mental Illness or Substance Abuse?**
If You are Disabled because of:
1.      Mental Illness that results from any cause;
2.      Any condition that may result from Mental Illness;
3.      alcoholism; or
4.      the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or any other such substance,

then subject to all other Policy provisions, benefits will be payable:
1.      only for so long as You are confined in a hospital or other place licensed to provide medical care for the disabling condition; or
2.      when You are not so confined, a total of 24 months for all such Disabilities during Your lifetime.  (R. 17).

****

## PRE-EXISTING CONDITIONS LIMITATIONS

**Are there any other limitations on coverage?**
No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability

begins after the last day of 12 consecutive month(s) during which you have been
continuously insured under this plan.  (R. 20).

****

**Pre-existing Condition** means:
1.     any accidental bodily injury, sickness, Mental Illness, pregnancy, or
       episode of Substance Abuse; or
2.     any manifestations, symptoms, findings, or aggravations related to or
       resulting from such accidental bodily injury, sickness, Mental Illness,
       pregnancy, or Substance Abuse;

for which you received Medical Care during the 6 month period that ends the day
before:
1.     your effective date of coverage; or
2.     the effective date of a Change in Coverage.

**Medical Care** is received when:
1.     a Physician is consulted or medical advice is given; or
2.     treatment is recommended, prescribed by, or received from a Physician.

Treatment includes but is not limited to:
1.     medical examinations, tests, attendance or observation; and
2.     use of drugs, medicines, medical services, supplies or equipment.  (R. 20).

## B.     Plaintiff's Application for Benefits.

On June 30, 2006, Plaintiff Linda Hart-Hyde began working as a Project Manager for

Chase Bank.  (R. 792-93 & 812).  This was a sedentary job.  (Id.)  Less than five months later, on

November 27, 2006, she stopped working and received short term disability benefits.  (R. 814).[1]

She complained of knee pain, restless leg syndrome, osteoarthritis, sleep apnea, fatigue,

depression, anxiety, decreased concentration and focus, difficulty making decisions, tearfulness,

insomnia, anhedonia, chronic back pain, chest pain and degenerative arthritis.  (R. 814-18).

Plaintiff sought long term disability ("LTD") benefits on or about April 18, 2007.  (R.

145-46).  During her initial interview, she stated that her primary medical condition was

degenerative joint disease in her knees, for which she had had several surgeries.  (R. 143).  She

---

[1] Although Hartford did not administer Plaintiff's STD claim, the plan provisions governing her claim apparently
did not include a pre-existing condition provision.

6

also stated that she had back problems and could not sit for long periods of time.  (Id.)  Her knee

pain began in the summer of 2006, and her back pain shortly thereafter.  (R. 144).  She also had

been treated for depression, anxiety and insomnia.  (Id.)  She stated that she could not return to

work because of the pain, her inability to walk or sit for prolonged periods of time, problems

with memory and an inability to multitask.  (Id.)

Plaintiff subsequently submitted her written application for LTD benefits.  (R. 761-91).

In her application, Plaintiff complained of high pain, inability to process information or

multitask, memory problems, confusion and severe anxiety.  (R. 761).  Her family doctor stated

that Plaintiff had chest pain, insomnia, chronic back pain and degenerative disc pain.  (R. 824).

### C.    Hartford's Initial Denial of Plaintiff's Claim for Benefits.

On June 14, 2007, Hartford denied Plaintiff's claim under the Pre-Existing Condition

provision of the Plan.  (R. 101-04).  It bars the award of LTD benefits based upon Pre-Existing

Conditions for which Plaintiff received Medical Care during the six-month period before the date

of coverage; here, January 1, 2006 to June 30, 2006 ("look-back period").  (R. 20).  Plaintiff's

medical records showed she received the following treatment during the look-back period:

- Treatment for chronic neck pain and cervical spondylosis and strain on 1/30/06 and 2/14/06.  (R. 528-30).
- Treatment for hypertension on 5/27/06.  (R. 672).
- Treatment for obstructive sleep apnea and restless leg syndrome on 6/7/06.  (R. 749-50).
- Treatment for knee pain NOS and restless leg syndrome on 6/26/06.  (R. 671).
- An MRI of her knee conducted on 6/27/06 supported diagnoses of degenerative joint disease, left knee, torn medial and torn lateral meniscus and osteoarthritis.  (R. 705-07 & 730-31).
- Prescriptions for Ambien CR [sleep aid] on 1/3/06, 1/31/06, 3/7/06, 4/5/06, 5/3/06 and 6/7/06.  (R. 770-72, 775).
- Prescriptions for Fluoxetine [a/k/a Prozac, depression/anxiety] on 1/25/06, 3/7/06, 4/7/06 and 5/12/06.  (R. 768).

Hartford determined that Plaintiff's claim was barred under the Pre-Existing Condition provision because she had received Medical Care for the conditions comprising her claim of disability during the look-back period:

> Our review of all of the medical information in your claim file shows that you are claiming benefits because of knee pain, Restless Leg Syndrome, Sleep Apnea[,] Osteoarthritis, Depression, Anxiety and Insomnia.  The medical records from Dr. Slayman, Dr. Duffey, and Dr. Sammader show that you were treated for these condition[s] on 1/30/2006, 2/13/2006, 2/14/2006, 5/26/2006, 6/7/2006, 6/27/2006 and 6/29/2006.  Pharmacy records also indicate you were prescribed medication for the above noted conditions for which you are claiming disability on 1/3/06, 1/31/06, 3/7/06, 5/3/06 and 6/7/06…. This information shows that your condition was Pre-Existing.  (R. 102).

Accordingly, Hartford denied her claim.  (Id.)

### D.     Plaintiff's First Appeal.

In February 2008, Plaintiff's counsel notified Hartford that she "is awaiting test results and, possibly, opinions from her physician with respect to whether any of her ailments can or should be considered 'pre-existing'…." (R. 485).  Because she "cannot yet provide information that definitively would satisfy the Appeals Unit with respect to the pre-existing condition issue," she requested a 90-day extension of the deadline to file her appeal.  (Id.)  Although not required to do so, Hartford granted Plaintiff a 60-day extension.  (R. 481).

Plaintiff submitted her first appeal on April 30, 2008, approximately ten months after the initial denial.  (R. 312-13).  Her counsel asserted that "[m]any of the various illnesses … that render [Plaintiff] totally disabled were not pre-existing as that term is defined in the relevant plan documents." (Id.)  He specifically identified fibromyalgia and bi-polar disorder.  (Id.)  He submitted statements of disability from treating physicians Dr. Slayman and Dr. Mikulik.  (R. 317-18).  He also submitted a December 15, 2007 letter that awarded Social Security Disability ("SSD") benefits to the Plaintiff that were payable beginning in May 2007.  (R. 319-22).

**E.    Hartford's Denial of Plaintiff's First Appeal.**

*1.    Hartford obtained independent medical reviews on two issues.*

As required by the governing regulation (29 C.F.R. § 2560.503-1(h)(3)(iii) & (h)(4)),

Hartford requested independent medical reviews of the Plaintiff's physical and mental conditions

from health care professionals with appropriate training and experience in the field of medicine

involved in the medical judgment involved in the claim.  (R. 302-03).  Hartford asked each

reviewer to address both the pre-existing condition issue (i.e., January-June 2006) and the

Plaintiff's restrictions, if any, as of her last day of work on November 27, 2006.  (R. 303).

Hartford obtained reports from reviewing physicians Dr. Dorothy Lowe, who is Board

Certified in Internal Medicine, and Dr. Kelly Clark, who is Board Certified in Psychiatry.  (R.

291-301).  Each reviewer performed a detailed review of the medical records.  (R. 291-95 &

298-300).  Dr. Lowe attempted on several occasions to speak with treating physicians Dr.

Slayman and Dr. Mikulik, who did not return her calls.  (R. 291).  Dr. Clark was able to speak

with therapist Nancy Little, who met with Plaintiff in December 2006 and January 2007 (R. 565-

70) and told Dr. Clark that she "does not feel comfortable speaking to any restrictions or

limitations the claimant might have had.  The diagnosis was Adjustment Disorder, and there was

no indication of psychosis or dangerousness and no indication of Bipolar disorder."  (R. 298).

*2.    The reviewers gave their opinion with regard to the Pre-Existing
Condition issue.*

Hartford asked Dr. Lowe to "indicate if any of the medical information from the period

from 1/1/06 through 6/30/06 supports treatment for fibromyalgia, trochanti bursitis, and diffuse

arthrosis."  (R. 297).  Dr. Lowe found that "[t]he medical information provided does not support

treatment for fibromyalgia, trochanteric bursitis, or diffuse arthrosis from 1/1/06-6/30/06."  (Id.)

9

However, he noted that "[t]he records support that she was treated for cervicalgia, hypertension, knee pain due to meniscus tear and degenerative joint disease" during the look-back period.  (Id.)

Hartford asked Dr. Clark to "indicate if any of the medical information from the period from 1/1/06 through 6/30/06 supports treatment for bipolar disorder."  (R. 301).  She found that "[t]here is no indication that this claimant has any history of Bipolar disorder at any time."  (Id.)

### 3. The reviewers gave their opinion with regard to Plaintiff's restrictions and limitations, if any.

Despite its conclusion that many of Plaintiff's conditions were barred by the Pre-Existing Condition provision, Hartford considered whether any or all of Plaintiff's ailments supported restrictions and limitations.  Hartford asked Dr. Lowe to opine on the Plaintiff's "work capacity as of 11/27/06 in terms of Department of Labor work category" and to "include any appropriate restrictions."  (R. 295).  Dr. Lowe concluded that "[t]he submitted medical information supports that as of 11/27/06 to the present the claimant had right knee degenerative arthritis and a lateral meniscal tear, degenerative disc disease, moderate facet arthropathy and would be restricted to a sedentary capacity work."  (R. 295).  Notably, Dr. Lowe concluded that these restrictions were due to the same medical conditions that were pre-existing and within the look-back period.

Hartford also asked Dr. Clark to identify, as of 11/27/06, the Plaintiff's "mental nervous restrictions and limitations, if any."  (R. 300).  Dr. Clark concluded that "[a]s of 11/27/06 there is no evidence of limitations in functioning or vocational restrictions due to psychiatric disorder." (R. 300).  She also concluded that "[t]here is no evidence of psychosis, and despite complaints of poor focus, psychological testing did not support this objectively….  She had symptoms related to binge eating disorder and obesity, but there is no evidence of limitations in her functioning due to this."  (R. 300-01).

After conferring with Dr. Lowe, Dr. Clark stated they "agreed that while no psychiatric restrictions or limitations are supported by the record, her medical issues related to joint disease are of significance, and do require a restriction of vocation to sedentary work only."  (R. 298). But because Dr. Lowe concluded that Plaintiff was treated for joint disease during the look back period, these restrictions arose from a condition barred by the Pre-Existing Condition provision.

### 4. *Based in part on the reviewers' opinions, Hartford upheld its prior denial of the Plaintiff's claim.*

On July 14, 2008, based upon the medical records and reviews performed by Dr. Lowe and Dr. Clark, Hartford upheld its decision to deny Plaintiff's claim.  (R. 285-89).  In so doing, Hartford considered the award of SSD benefits and the April 2008 statements by Dr. Mikulik and Dr. Slayman, but found that the totality of the information supported its prior decision to deny her claim based upon the Pre-Existing Condition provision in the Plan.  (R. 287-88).  In addition, based upon the reports from Dr. Lowe and Dr. Clark, Hartford concluded that Plaintiff was capable of sedentary work (which her own occupation was) despite her self-reported limitations and the statements of her treating physicians.  (R. 288).  Accordingly, Hartford upheld its prior denial based upon the Pre-Existing Condition provision, further found that her medical conditions were not disabling, and gave the Plaintiff another opportunity to appeal.  (R. 285-89).

### F. Plaintiff's Second Appeal.

Plaintiff submitted her second appeal through her counsel on December 24, 2008.  (R. 239-80).  She enclosed additional medical records and letters from three treating physicians:

- Dr. Slayman stated on May 12, 2008 that Plaintiff "suffers from multiple diagnoses which include depression with anxiety issues, possible bipolar disorder, chronic insomnia, asthma, sleep apnea, generalized arthritis, hypertension and chronic fatigue. All of these tend to exacerbate her fibromyalgia symptoms.  This combination precludes her from any type of employment at this time."  (R. 241).

- Dr. Slayman further stated on August 14, 2008 that Plaintiff "has been a patient of mine for the past 5 years.  She has had multiple musculoskeletal issues throughout that time

period.  At the time that she stopped working in November 2006, she suffered from multiple arthralgias, arthritis, psychiatric issues, and a myofacsial pain disorder, all of which is compatible with fibromyalgia.  All together, her multiple issues were totally disabling, thereby precluding any gainful employment." (R. 242).

- Psychiatrist Connie Hirsh stated on August 25, 2008 that she had been treating Plaintiff since March 2008 and had diagnosed her with Schizoaffective Disorder, bipolar type and Post Traumatic Stress Disorder.  (R. 243).

- Dr. Mikulik stated on July 9, 2008 that Plaintiff "is a patient of mine who suffers from multiple diagnoses which includes Osteoarthritis, trochanteric bursitis, and fibromyalgia. Fibromyalgia precludes her from any type of employment at this time."  (R. 244).

- Dr. Mikulik further stated on October 7, 2008 that "[i]t is my opinion, based on review of medical records and interviews with [Plaintiff], that she suffered from fibromyalgia in November 2006, and such condition in combination with osteoarthritis was disabling." (R. 245).

### G.      Hartford's Denial Of Plaintiff's Second Appeal.

Hartford again requested independent medical reviews of the Plaintiff's physical and

mental conditions, and evaluated both the pre-existing nature of her conditions and whether they

were disabling.  (R. 233-34).  Dr. Michael Fisher, who is Board Certified in Psychiatry,

performed a detailed review of the medical records.  (R. 215-19).  He noted that Plaintiff had

denied being depressed on June 21, 2007 and had never been prescribed antipsychotics or mood

stabilizers.  (R. 216).  He also spoke with Dr. Hirsh, who opined that the Plaintiff "has had a long

standing depression" and "should not be under a lot of stress, such as work."  (R. 220).

However, she "has not specifically told [Plaintiff] about anything that she should not do."  (Id.)

Dr. Fisher found that "[t]here is no clear documentation" that the Plaintiff was treated for

depression and anxiety between 01/01/2006 and 06/30/2006, as "[t]here was mention of the use

of Prozac in the note of 5/26/06, however, there was no diagnosis attached that would support the

use of this medication, so it is unclear as to the exact reason why the Prozac was prescribed."  (R.

220).  He also found that Plaintiff had been impaired by depression and anxiety on November 27,

2006 and through January 2007, but "[t]here was insufficient documentation beyond that to

support a continuation of impairment from a psychiatric standpoint." (R. 220). He explained:

> The available evidence would indicate that there were impairments in the
> claimant's concentration and focus, decision-making and the ability to maintain
> emotional equilibrium. The period of time that clearly could be documented with
> respect to these impairments was from 11/27/2006 through the end of January
> 2007. Beyond that, the only other available psychiatric record was the letter from
> Dr. Hirsh, but there was no records of visits with the patient and no clear
> documentation of impairments and how those were manifested.
>
> ****
>
> With respect to her condition after the end of January 2007, there were notes from
> her PCP's office indicated [sic] that there had been an overall improvement. A
> note from 06/21/07 written by Linda Ambrose, CNP, indicate[d] that the claimant
> denied sleep problems, weight gain, weight loss, depressed mood, feeling
> overwhelmed, suicidal ideation, hallucinations, worry, anhedonia, decreased
> motivation and racing thoughts. (R. 221).
>
> ****
>
> Dr. Hirsh does state clearly that the claimant has suffered from a schizoaffective
> disorder of the bipolar type and described episodes of mania and hypomania
> occurring around the time of her last day worked of 11/26/2006. There was no
> documentation of the claimant's symptoms in the record at the time of the
> reported symptoms. There also is no record of Dr. Hirsh's actual visits with the
> claimant, which would support Dr. Hirsh's description of the claimant. Dr. Hirsh
> reports that the claimant has trouble with her memory, but had no specifics about
> that other than neuropsychological testing which had been done. Also, having a
> diagnosis of schizoaffective disorder does not necessarily mean that the claimant
> was impaired in her capacity to perform the duties of her position. More specifics
> about her day-to-day functioning from the standpoint of psychiatric status might
> support the position that the claimant could not perform her job, but again this
> was lacking. (R. 222).

The independent reviewer who evaluated Plaintiff's non-psychiatric symptoms similarly

found that the Plaintiff was not restricted from working. Dr. Richard Kaplan, who is Board

Certified in Physical Medicine and Rehabilitation, performed a detailed review of the medical

records. (R. 223-27). He also left three messages for Dr. Slayman and Dr. Mikulik, who did not

return his calls. (R. 212-13 & 227). Dr. Kaplan concluded that Plaintiff "has a combination of

bilateral knee derangements with degenerative changes as well as fibromyalgia, and these symptoms collectively had been present prior to 01/01/06, and [she] continued with treatment for these conditions during the period of 01/01/06 through 06/30/06" and thereafter. (R. 228). He stated that Plaintiff would be limited to sedentary work with certain additional restrictions. (Id.) Thus Dr. Kaplan, like Dr. Lowe, concluded that Plaintiff's work restrictions resulted from conditions for which she had been treated during the look-back period. Finally, he noted that "[s]uch sedentary work is recommended at a minimum, on a full-time basis, as likely to be therapeutic of itself to address the superimposed fibromyalgia." (R. 230).

Based upon its review of the medical records, the independent reviews by Dr. Fisher and Dr. Kaplan, and the opinions of Plaintiff's treating physicians, Hartford upheld its prior decision to deny benefits. (R. 72-75). Ms. Kelly's letter stated, in part:

> Review of the records indicates that [Plaintiff] was seen and treated during the pre-existing period for arthritis, knee pain, restless leg syndrome, sleep apnea, osteoarthritis, hypertension, depression, anxiety, insomnia, morbid obesity, and low back pain. [R. 73]
>
> ****
>
> …. Dr. Fisher was of the opinion that the record indicates that the claimant was treated for depressive symptoms and anxiety, which caused some functional impairments and restrictions from 11/27/06 until the end of January 2007 and advised there was insufficient documentation beyond that time to support a continuation of impairment from a psychiatric standpoint. [R. 73]
>
> ****
>
> Dr. Kaplan opined … that [Plaintiff] does have functional restrictions/limitations as of 11/27/06 to the present as a result of conditions that were treated during the period of 1/1/06 through 6/30/06…. Dr. Kaplan opined that the claimant has a combination of bilateral knee derangement with degenerative changes as well as fibromyalgia and the symptoms collectively had been present prior to 1/1/06 and the claimant continued with treatment for the conditions thereafter. With regard to function, Dr. Kaplan opined that [Plaintiff] could perform at the sedentary physical demand work level, with additional restrictions … and that these restrictions would be permanent and such sedentary work is recommended at a

minimum on a full time basis as likely to be therapeutic of itself to address the patient's superimposed fibromyalgia. [R. 74]

****

Although [Plaintiff] was not treated and/or diagnosed with various condition(s) during the pre-existing period, the medical evidence does not support documentation that she would have been precluded from a physical standpoint from performing her sedentary type regular occupational work activity as a Technology Project Manager as of 11/27/06 and continuing to the present…. [R. 75]

****

From a mental/nervous standpoint, [Plaintiff] has a history of depression and regardless of what diagnosis she was or was not treated for during the pre-existing period, her mental/nervous condition in the opinion of Dr. Fisher precluded her from performing her occupational work activity through the end of January of 2007 and beyond that there was no clear documentation of impairment from a psychiatric standpoint. Therefore, even if she was eligible for benefits from a mental/nervous standpoint, she would not have met the 182 day elimination period. [R. 75]

This lawsuit followed.

## IV. HARTFORD REASONABLY DENIED PLAINTIFF'S CLAIM FOR BENEFITS AND ITS DENIAL WAS NEITHER ARBITRARY NOR CAPRICIOUS.

The facts described above establish that Hartford's decision to deny Plaintiff's claim for benefits was supported by substantial evidence and resulted from a deliberate and principled reasoning process which duly evaluated every potential basis for Plaintiff's claim for benefits. It is also clearly "possible to offer a reasoned explanation" for Hartford's decision based on the evidence in the administrative record. Accordingly, Hartford's denial was not arbitrary or capricious and Defendants are entitled to judgment on the administrative record.

### A. Hartford Reasonably Concluded That The Pre-Existing Condition Provision Barred Plaintiff's Claim, And Its Conclusion Is Supported By Substantial Evidence.

Hartford initially denied Plaintiff's claim under the Pre-Existing Condition provision, which bars payment of benefits for any Pre-Existing Conditions for which Plaintiff received

15

Medical Care during the first half of 2006.  (R. 101-04).  Her records confirm that during that time period, she was treated for chronic neck pain, cervical spondylosis and strain, hypertension, obstructive sleep apnea, restless leg syndrome, knee pain, degenerative joint disease in her left knee, torn medial and torn lateral meniscus and osteoarthritis.  (R. 528-30, 671-72, 705-07, 730-31, 749-50).  They also show that she had been prescribed Ambien, which is used to treat insomnia, and Prozac, which is used to treat depression and anxiety.  (R. 768, 770-72 & 775).  Moreover, Plaintiff stated during her initial interview that she had previously been treated for depression, anxiety and insomnia.  (R. 144).

When Plaintiff submitted her first appeal, Hartford asked the reviewing physicians to opine about whether she had received treatment for any of her alleged ailments during the look-back period.  Dr. Clark concluded that "[t]here is no indication that [Plaintiff] has any history of Bipolar disorder at any time." (R. 301).  Dr. Lowe found that the records did "support that [Plaintiff] was treated for cervicalgia, hypertension, knee pain due to meniscus tear and degenerative joint disease" during the look-back period.  (R. 297).  However, Dr. Lowe concluded that the records did "not support treatment for fibromyalgia, trochanteric bursitis, or diffuse arthrosis from 1/1/06-6/30/06."  (Id.)

When Plaintiff submitted her second appeal, Hartford asked the reviewing physicians to identify any functional restrictions/limitations on and after November 27, 2006 that resulted from any conditions for which Plaintiff was not treated during the look-back period.  (R. 220 & 228).  Dr. Fisher stated that there was "no clear documentation" that Plaintiff was treated for depression and anxiety as the May 2006 use of Prozac was unexplained (R. 220)—but apparently did not note the numerous prescriptions for Prozac during the look-back period.  Dr. Kaplan concluded that Plaintiff was functionally impaired by "a combination of bilateral knee derangements with

16

degenerative changes as well as fibromyalgia" and that she had "continued with treatment for these conditions during the period of 1/1/06 through 6/30/06." (R. 228).

These opinions provide substantial evidence that the Pre-Existing Condition provision bars Plaintiff's claim to the extent it is based upon complaints of chronic neck pain, cervical spondylosis and strain, hypertension, obstructive sleep apnea, restless leg syndrome, knee pain, degenerative joint disease in her left knee, torn medial and torn lateral meniscus, osteoarthritis, insomnia, cervicalgia, bilateral knee derangements, fibromyalgia, depression and anxiety. Hartford's reliance on the Pre-Existing Condition provision is therefore supported by substantial evidence. Indeed, Plaintiff implicitly conceded as much when her counsel sought additional time in which to file an appeal because Plaintiff could not "yet provide information that definitively would satisfy the Appeals Unit with respect to the pre-existing condition issue." (R. 485).

**B.    To The Extent That The Pre-Existing Condition Provision Did Not Bar Plaintiff's Claim, Hartford Reasonably Concluded That Plaintiff Was Not Disabled And Its Conclusion Is Supported By Substantial Evidence.**

When Plaintiff submitted her first appeal, Hartford also asked its reviewers to determine whether she would be able to work and, if so, at what level and with what restrictions. Dr. Clark concluded that "[a]s of 11/27/06 there is no evidence of limitations in functioning or vocational restrictions due to psychiatric disorder." (R. 300-01). Dr. Lowe concluded that "[t]he submitted medical information supports that as of 11/27/06 to the present the claimant had right knee degenerative arthritis and a lateral meniscal tear, degenerative disc disease, moderate facet arthropathy and would be restricted to a sedentary capacity work." (R. 295). Both physicians "agreed that while no psychiatric restrictions or limitations are supported by the record, her medical issues related to joint disease are of significance, and do require a restriction of vocation to sedentary work only." (R. 298). Hartford appropriately relied upon the opinions of these reviewers when it denied the Plaintiff's first appeal.

17

Similarly, when Plaintiff filed a second appeal, Hartford asked the reviewers to identify any restrictions on and after November 27, 2006 that resulted from any conditions for which Plaintiff was not treated during the look-back period. (R. 220 & 228). Dr. Fisher concluded that Plaintiff was impaired by "depressive symptoms and anxiety" from November 27, 2006 to the end of 2007 and that "[t]here was insufficient documentation beyond that to support a continuation of impairment from a psychiatric standpoint." (R. 220). Dr. Kaplan concluded that Plaintiff would be limited to sedentary work with certain additional restrictions. (R. 228).

Again, Hartford appropriately relied upon the opinions of these reviewers when it denied the Plaintiff's appeal. Hartford concluded that there was no documentation of any psychiatric impairment after January 2007, which was before the end of the Elimination Period. (R. 75). Hartford also concluded that Plaintiff was capable of performing sedentary work with certain restrictions on and after November 27, 2006. (R. 75). Notably, both Dr. Lowe and Dr. Kaplan had concluded that these restrictions resulted from medical conditions for which Plaintiff had been treated during the look-back period. Hartford's conclusions were supported by substantial evidence in the record, including all of the evidence discussed above.

### C. Hartford Appropriately Considered, But Correctly Declined To Follow, The Social Security Administration's Award Of Disability Benefits.

Hartford considered but did not adopt the SSA decision to award benefits to the Plaintiff. (R. 287-88). This decision was entirely appropriate, particularly since Hartford based its denial substantially upon evidence showing that the Pre-Existing Condition provision barred Plaintiff's claim. The SSA decision is entirely irrelevant with respect to that issue. *Thiel v. Life Ins. Co. of N. America*, Case No. 07-1371, 2008 WL 852489, at *3 (6th Cir. Mar. 6, 2008).

Moreover, it is well-established that Hartford was not required to defer to or follow the SSA decision. The Sixth Circuit has explained that SSA awards are not binding on ERISA plans

because the "SSA regulation governing the weight to be accorded physicians' opinions does not apply" and, further, because they may be inapplicable where "the SSA's definition of disability is not the same" as the plan definition, or where the Plan's decision is based upon evidence that was not presented to the SSA. *Wical v. The Int'l Paper Long-Term Disability Plan*, Case No. 05-3717, 2006 U.S. App. LEXIS 18342, at *20-24 (6th Cir. July 20, 2006). Moreover, because the Court applies an arbitrary and capricious standard of review, it could uphold an insurer's decision to deny benefits even thought the SSA reviewed the same evidence and came to a different but still reasonable conclusion. *Hurse v. Hartford Life & Accident Ins. Co.*, Case No. 02-5496, 2003 U.S. App. LEXIS 20030, at *19-20 (6th Cir. Sept. 26, 2003).

### D. Hartford Appropriately Considered, But Declined To Follow, The Opinions Of Plaintiff's Treating Physicians.

Hartford also appropriately considered but did not follow the opinions of the Plaintiff's treating physicians. (R. 73-74 & 287). Naturally, her physicians focused on her conditions as a whole, without regard to the Pre-Existing Condition provision. By contrast, Hartford based its decision substantially upon evidence showing that the Pre-Existing Condition provision barred Plaintiff's claim. Dr. Lowe and Dr. Kaplan both concluded that the restrictions that applied to Plaintiff resulted from conditions for which she had been treated during the look-back period, including joint disease and fibromyalgia. These medical conditions had the most significant impact upon the Plaintiff but could not be considered under the terms of the Plan, whereas Plaintiff's treating physicians could consider them. In addition, the Plaintiff's physicians did not describe any specific limitations or provide objective evidence to substantiate their opinion that Plaintiff was totally disabled. Hartford acted well within its discretion when it favored the opinions of its reviewing physicians, who identified specific limitations and discussed objective evidence, over the non-specific and conclusory assertions of Plaintiff's treating physicians.

It is well-established that Hartford was not required to defer to the opinions of Plaintiff's treating physicians or satisfy a "heightened burden of explanation" with regard to its decision not to do so. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). This rule makes sense given that treating physicians may have an incentive to advocate on behalf of patients seeking disability benefits. *Id*. at 832 (noting that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'").

It is also well-established Hartford may rely on the medical opinion of a reviewing physician over that of a treating physician, provided that it does not totally ignore the opinion of the treating physician. *Balmert v. Reliance Standard Life Ins. Co.*, 594 F.3d 496, 503 (6th Cir. 2010); *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). Hartford is "free to favor these opinions" by its reviewing physicians over those of Plaintiff's treating physicians "without being found to have acted arbitrarily." *Lee v. MBNA Long Term Disability & Benefit Plan*, 2005 U.S. App. LEXIS 4990, at *30 (6th Cir. Mar. 29, 2005); *see also Douglas v. General Dynamics Long Term Disability Plan*, Case No. 00-2431, 2002 WL 1822906, at *3 & 5 (6th Cir. Aug. 7, 2002) (denial of benefits not arbitrary or capricious where "the Plan Administrator received opinions from two independent medical evaluators which concluded that Douglas was not disabled because he could perform some work," even though his treating physician opined that he was disabled). Hartford's decision here is fully consistent with this governing case law.

## V.   CONCLUSION.

For the foregoing reasons, Hartford did not act arbitrarily or capriciously when it denied Plaintiff's claim for benefits. Accordingly, Defendants request that this Court grant their Motion for Judgment on the Administrative Record and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,


 s/  Caroline H. Gentry
Caroline H. Gentry (0066138)
  Trial Attorney
PORTER, WRIGHT, MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, Ohio  45402-2028
(937) 449-6748 / (937) 449-6820 Fax
cgentry@porterwright.com

ATTORNEY FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30th, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

                s/  Caroline H. Gentry

Caroline H. Gentry (0066138)
  Trial Attorney
PORTER, WRIGHT, MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, Ohio  45402-2028
(937) 449-6748 / (937) 449-6820 Fax
cgentry@porterwright.com

ATTORNEY FOR DEFENDANTS
